UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JOHNATHAN JAMES,

    Defendant.

_____/

Case No. 13-CR-20794
Hon. Denise Page Hood

**MEMORANDUM OPINION AND ORDER
REGARDING MOTION TO SUPPRESS
AND
SETTING PRETRIAL CONFERENCE**

    This matter comes before the Court on the Defendant Johnathan James' Motion to Suppress Evidence Seized Pursuant to "Terry Stop." **[Docket No. 24, filed February 21, 2014]** The Government filed a Response to this Motion on March 28, 2014, **[Docket No. 28]** to which Defendant filed a Reply. **[Docket No. 29, filed April 2, 2014]** The Court held evidentiary hearings on this matter.

**I.**    **BACKGROUND**

    Defendant is charged with violating 18 U.S.C. § 922(g) - Felon in Possession of a Firearm after, having been convicted of a crime punishable by imprisonment for a term exceeding one year, Defendant "knowingly possess[ed] in and affecting interstate commerce a firearm, . . . a Raven Arms .25 caliber handgun, said firearm

having been shipped and transported in interstate commerce" in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  **[Indictment at 1]**

    A.    **Police Report**

The Government relied on the Police Report in their response to Defendant's motion.  The Police Report states that on September 16, 2013, Detroit Police Officers Earnest Cleavers and James Taylor were on patrol in the area of 7 Mile and Lahser Roads in the City of Detroit, Michigan where they saw a group of men "lurking around the front door of United Party Store." **[Docket No. 28, Ex. 1]** "Fearing possible armed robbery" and knowing from prior experience that the area was a "high crime area," the officers pulled into the parking lot of the store. **[Id.]** The Report states that the men began to walk east towards Lahser when Defendant in particular "looked stunned and was speechless" as the officers approached the group of men.  **[Id.]** The officers claimed to have asked the group how their night was going and assert that Defendant began stuttering and was unable to give a clear reponse. **[Id]**  The officers also contend that they say what appeared to be a bulge in the "right side pocket" of Defendant "above his knee."  **[Id.]**

The officers exited their squad car and approached the group.  The report states that Defendant "turned around" and that the officers "could smell the odor of marijuana" as they approached.  **[Id.]**  Officer Cleaves, the reporting officer, asserts

that Defendant's actions along with his experience as a police officer with several gun arrests led him to believe that Defendant may be armed with a handgun. **[*Id.*]** Officer Cleaves "patted [Defendant's] right side pant pocket" and retrieved a small handgun where he had previously seen the bulge. **[*Id.*]** The report claims that Defendant stated that he was only carrying the weapon "to protect his family." The handgun, a Raven .25 caliber, was loaded with six (6) live rounds with one live round in the chamber. Defendant was arrested and taken into custody. **[*Id.*]**

### B. The Hearing

Four witnesses testified at the suppression hearing, including the two arresting officers, both Detroit Police officers, both African American, Defendant, and Defendant's friend who was present at the scene. Officer Ernest Cleaves has been a member of the Detroit Police Department for thirteen years. He was assigned to the Second Precinct Special Operation on the day of this incident, September 16, 2013. He was patrolling the 7 Mile/Lahser area in a fully marked scout car with his partner, Officer James Taylor. Cleaves was the driver going west on 7 Mile Road at about 5-10 miles per hour. He had an unobstructed view of the strip mall where there was a party store and a chicken restaurant, among other stores. At that time, he observed several males standing near the front of the chicken restaurant. Cleaves pulled into the parking lot and rolled down the car window, engaging the men by asking the men how

they were doing and how the night was going. Cleaves testified that Defendant began to walk away from the group, heading east. Cleaves testified that James did not respond to the officers' questions, just mumbled. Cleaves stated that James "bladed" his right side away from the officers, to "hide" his right side away from Cleaves. Cleaves noted that armed individuals "blade" their bodies away to prevent police from seeing a bulge in their clothing. He noted that the Defendant looked shocked, unsure of where he was going and gave the officers a blank stare. These were all suspicious mannerisms to Cleaves. The officer said there was the smell of marijuana. The officer also noted that Defendant was wearing sagging jeans and there was a bulge near his right knee on the hip area which Cleaves believed to be a gun. Officer Cleaves then exited his vehicle, stopped the Defendant and patted him down, finding a small loaded handgun in Defendant's pocket. Cleaves admitted that the bulge he saw could have been a wallet or a cell phone.

Defendant Cleaves did not see Defendant exit from a vehicle. He could only say that the men had been there 30 seconds or so; he observed them for 15-20 seconds. The other men with Defendant walked the other way and his partner focused on them. Cleaves was not sure if his partner stopped any of the other men.

Defense counsel noted several inconsistencies between Cleaves' testimony and the police report and activity log of the officers. Of note is that the police report states

there were several males in front of the store while the Activity Log states only one male.

Officer James Walter Taylor III is a Detroit Police Officer with 14 years of police experience. He was Cleaves' partner on the day of the incident and the passenger in the police vehicle. Taylor testified that he saw three people standing between the liquor store and the fish market near the chicken restaurant at 7 mile Road and Lahser. He noted that he was very familiar with the area and usually there is an ebb and flow to these businesses; people going in and out. Taylor noted that Defendant seemed "really nervous" when the officer approached and asked what was going on. He testified that Defendant walked off like he was about to sprint; a fast paced walk. Prior to that, Taylor testified that Defendant just stopped talking to the other men and walked off when he saw the police. He stated "Like it's something wrong with that. We want to see—it's something wrong with that when a person just sees us and everybody else is not frightened or startled. The other people are there and the one person looks like oh, I got to get out of here, almost like he's about to take flight right before he does it." (Tr. 4/28/14 at 62:18-22) Taylor admitted he only observed Defendant a few seconds. He also stated Defendant "bladed his body away;" "his right leg went back. His right leg went back. His left leg was front and that right side of his body he just turned away from my partner and from me." (Tr. 4/28/14 at

5

63:18-19) He further stated that based on his experience Defendant was trying to hide something on that side. Taylor also explained what he meant when he wrote in his report that the Defendant appeared dumb-founded. "He looked surprised like oh my God, the police is right here. His eyes was bulging out and widening and he just looked like he didn't know what to do. It was almost like he wanted to run, but we were so close to him—he was surprised that we were there and he just couldn't even come to grips that the police is here." When asked why Defendant's actions were suspicious, Taylor responded, "His was consistent with my past experience as a man who was committing robberies. I believe with compounding of the runs that was coming out over there, and my—and the observations that I see, I thought there was something wrong with his actions and I thought he was armed." (Tr. 4/28/14 at 65:18-21) Upon cross examination, Taylor agreed that he had noted in his activity log that Defendant clutched his pocket as if armed and looked for a way to escape, but the Activity Log only notes that Defendant clutched his pocket. Taylor did not smell any marijuana.

     Officer Taylor testified that he suspected the Defendant was doing something wrong (prior to the officers approaching him) because Defendant reacted differently than the other people he was with initially, stating, "just that alone means something is wrong with him and he don't want no police contact." (Tr. 5/13/2014 at 39:6-7)

Taylor then backtracked, "…But no, not him doing a crime, but I was, I believe he was armed, but the other men you want to talk to them." (Tr. 5/13/2014 at 40:2-3)

Officers Cleaves and Taylor were both assigned to the Detroit Police Department Special Operations at the time of this incident. They explained that Special Operations is a city-wide unit that focuses on high crime areas of the city. The unit receives updated crime reports daily and officers are deployed to areas where more crime is happening. Officer Cleaves testified that they were just patrolling the 8th Precinct that day, the area of 7 Mile Road and Lahser, but not based on a call. Officer Taylor, however, testified that he was scanning the radio and heard there were a lot of robberies in that area and that the dispatcher kept giving out runs consistent with robberies and guns in the 7 Mile Road and Lahser area. Both officers testified that they were in the area of 7 Mile Road and Lahser because it is a "high crime area." In this case, as compared to some others,[1] there is more precise testimony about what constitutes a "high crime area" in Detroit. Of note is that this incident took place in daylight, in a well-traveled area. Officer Taylor testified that an area does not always stay a high crime area. He noted that for a couple of days an area will "light up" with robberies and more enforcement is then put into that area and crime will go down.

---

[1] *United States v. Davis,* Case No. 11-20703, 2013 WL 71821 (E.D. Mich. Oct. 29, 2013), *aff'd* 544 Fed. Appx. (6th Cir. Feb. 13, 2014).

People will then go to another area and that will become at high crime area. He noted that he had worked the 7 Mile and Lahser area a great deal and at the time of this incident 7 Mile and Lahser was very high crime area in terms of robberies and car jackings. Taylor noted that he had heard a lot of dispatches for robberies and carjackings in that area that day and the day before. Taylor also testified to what the Court characterizes as a "profile" of a man "apparently scouting for targets to rob;" "…somebody just standing there, looking for targets…not interested in walking in the door or walking out the door." (Tr. 5/27/14 62:2-5)  Specifically as to Defendant, Taylor testified "His [actions] was consistent with my past experience as a man who was committing robberies. I believe with compounding of the runs that was coming out over there and my…and the observations that I seen, I thought there was something wrong with his actions and I thought he was armed."

Taylor then expounded on how a person commits a robbery, where a robber stands in relation to cameras in an area, how a person picks a victim, that robbery occurs outside of stores where there are fewer witnesses.  That opinion was based on his training and experience.

Officer Cleaves testified he saw the group of men and Defendant standing around, observing patrons of the party store, coming in and out, just looking at the people coming in and going out to their cars. When asked if that was unusual to him,

he testified, "Sometimes it can be, yes." And why, "Sometimes it can lead to other things like robberies or carjackings." Although he has never seen that happen, Officer Cleaves has taken record and handled runs where that happened. He then explained how a carjacking could occur, based on his training and experience.

## II. ANALYSIS

The Supreme Court has identified three types of reasonable, permissible, and warrantless encounters between the police and citizens: 1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; 2) a temporary involuntary detention or *Terry*[2] stop which must be predicated upon "reasonable suspicion;" and 3) arrests which must be based upon "probable cause." *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008). A "consensual encounter" occurs when "a reasonable person would feel free to terminate the encounter." *United States v. Drayton*, 536 U.S. 194, 201 (2002). *See also, e.g.*, *United States v. See*, 574 F.3d 309, 315 (6th Cir. 2009) (demonstrating that unless there is other coercive behavior, a police officer can initiate a consensual encounter by parking his police vehicle in a manner that allows the defendant to leave).

"Once a consensual encounter escalates to the point where the individual is

---

[2] *Terry v. Ohio*, 392 U.S. 1 (1968).

9

'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007). In evaluating a *Terry* stop, the court engages in a two-part analysis of the reasonableness of the stop: whether there was a proper basis for the stop, and, if the stop was proper, whether the degree of intrusion was reasonably related in scope to the situation at hand. *United States v. Smith,* 594 F.3d 530, 536 (6th Cir. 2010). "Reasonable suspicion" is a less demanding standard than "probable cause." *United States v. Mays,* 643 F.3d 537, 542 (6th Cir. 2011). It requires a showing considerably less than preponderance of the evidence; but, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. *Id.* (citations omitted). The officers must be able to articulate more than an inchoate and unparticularized suspicion or hunch. *Id.* The officers' determination is made in light of the totality of the circumstances. *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Defendant argues that the language in the Complaint, the Detroit Police Department Arrest Report, and the officers' testimonies are "pre-textual in that they identify the area in question as being [a] 'high-crime' area without a factual basis for the same. The Defendant claims that the Government so asserts so as to provide a fiction to validate the 'Terry Stop', and the introduction of the firearm in evidence

regarding the charge of Felon in Possession." **[Docket No. 24, Pg ID 58]** Defendant further argues that the officers and the Government should not be "allowed to make subjective assertion of the 'high-crime' nature of the area, without verifiable evidence. To do otherwise allows the police to manipulate the Fourth Amendment protection of citizen as to whether an area is a 'high-crime' area is a 'legal (Constitutional) fact.'" **[*Id*.]**

As stated earlier this is arguably the best testimony this Court has heard supporting an area in Detroit as "a high crime area." The officers at least have familiarity with the area and a basis beyond that for their claim, including updated crime reports, dispatches they have heard, and recent reports of increased criminal activity. The Court is satisfied that, for the purpose of this motion, the officers' testimonies support their claim that the area is a "high crime area" at least on some occasions. However, just because the police are patrolling a "high crime" area does not give them free license to stop just anyone. The police must have more.

Defendant contends that he was not "lurking" in front of the store and that any bulge that may have been in his pocket did not create the reasonable, articulable suspicion required to stop and search him because "even though a particular officer might believe a bulge conceals a weapon, a purely subjective impression is not an "objective justification" that can be judicially examined against the requirements of

the Fourth Amendment." **[*Id.* at Pg ID 65]** Defendant further claims that he did not attempt to walk away when confronted by the police officers initially, as well as when he was directly confronted by the police officers **[*Id.* at Ex. B]**, "which is in direct conflict with the reference made in the Detroit Police Activity Log" **[*Id.* at Ex. A]** and with the officers' testimony.

In response, the Government argues that, based on the totality of the circumstances, the officers had a particularized and objective basis to stop and search Defendant. The Government relies on the following:

> the general location of 7 Mile and Lahser Roads was known to them to be a high crime area; they saw Defendant, while loitering as part of a group in front of a party store, paying an unusual amount of attention to the shoppers; when Defendant (and his fellow loiterers) spotted the Officers, they began to walk away; when Defendant saw the Officers he clutched at the bulge in his pocket and began to look around as if for a flight route; when the Officers rolled up to the group and asked them how their night was going, Defendant began to stutter and was unable to give a clear response; when the Officers rolled up to the group, they again saw the bulge in Defendant's pocket; after the Officers got out of their car and approached, Defendant turned his body in an attempt to obscure the bulge from their view; and as the Officers walked toward Defendant and the group of loiterers they smelled the odor of marijuana.

**[Docket No. 28, Pg ID 82]** This information, the Government contends, is "much

more than a mere hunch and constituted a specific and articulable factual basis for suspecting that criminal activity was afoot." **[*Id.*]** The Government argues that should the Court determine that the officers behaved improperly during this encounter, the evidence should still not be suppressed because the exclusionary rule is inapplicable.

In this instance, there may be some argument that the point of contact began as a consensual encounter, initiated by the police without an articulable reason to briefly ask the Defendant and the other men some questions. Officer Cleaves' testimony would support a consensual contact since he claims he observed the men standing near the chicken restaurant, pulled into the parking lot, rolled down the window and began to ask questions about how the men were doing and how the night was going. Officer Taylor's testimony could be said to be in support of such a consensual encounter as well. In order for a consensual encounter to escalate to a seizure, an officer must have reasonable suspicion of criminal activity to justify a stop under *Terry*, or probable cause to support an arrest, in order for a seizure to be in compliance with the Fourth Amendment. *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007) Officers Cleaves and Taylor had no such reasonable suspicion here that would support the initiation of a temporary involuntary detention, or *Terry* stop.

As previously noted, a consensual encounter occurs when a reasonable person feels free to terminate the contact. *United States v. Drayton*, 536 U.S. 194, 201 (2002).

Defendant, according to the story related by the police officers, was exercising his right to terminate the contact by walking away from the police officers and barely responding to the officers' questions. But these officers were already deciding that Defendant had committed a crime. Officer Taylor's response to Defendant's decision to walk away was his elaborate testimony of the Defendant's eyes bulging and his surprise that the police were there. Officer Taylor testified the actions were consistent with his past experience of a man committing robberies. Officer Taylor claims Defendant clutched his pocket. Officer Taylor went on to say the he believed the Defendant was engaged in wrong doing because he acted differently from the other men, stating that acting differently alone meant something was wrong with Defendant. Officer Cleaves also determined that Defendant's movement away from the police was enough to stop him. Officer Cleaves described this as "blading away" trying to hide his right side, even though Officer Cleaves, in his vehicle, admitted the bulge he saw could have been a wallet or cell phone. The officers cannot articulate more than "an inchoate and unparticularized suspicion or hunch," even considering the totality of the circumstances.

    Looking at the totality of the circumstances in this instance, is there reasonable suspicion to stop Defendant and to then search him? This Court finds there is not. In determining whether there was reasonable suspicion to support this stop, the Court

14

considers a number of factors, combined to form a totality of circumstances.

The testimonies of Officers Cleaves and Taylor are by far the best descriptions of what constitutes a "high crime" area of Detroit that this Court has heard in any court proceeding. That the Detroit Police Department analyzes the "hot spots" of crime around the city and sends extra officers into those areas is commendable. That these "hot spots" of crime are often temporary and move from place to place adds credibility to the testimony about the location of a high crime area. The generalized testimony is credible and worthwhile. The problem in this case is that the specific testimony is not consistent. Nor do the facts support suspicious activity rising to the level of a legal stop of Defendant James.

Officer Cleaves' testimony is that they were just patrolling the area. Officer Taylor's testimony is that there are numerous dispatches over the radio of crime in the area of 7 Mile Road and Lahser. Neither officer can address any particular incident that occurred in the area in the time frame of James' arrest or within the days prior to his arrest. While the area of 7 Mile Road and Lahser may be a high crime area, the specific evidence of such is thin.

The officers' testimony about the men they saw in front of this strip mall does not support their claim that Defendant or any of the men he was with could be said to be loitering, "scouting for targets to rob", or engaged in furtive conduct sufficient to

15

support a *Terry* stop of the Defendant. The officers observed the men for a very short time before they approached them.  Officer Cleaves said it was seconds. Officer Taylor said they were at the scene a total of eight minutes. Both officers said the men were together in a group, talking as the officers drove up.  A group of people outside a strip mall talking for less than ten seconds cannot be said to be loitering. Although Officer Taylor says the men were paying attention to shoppers; that alone does not amount to loitering or furtive behavior.  People watching, without more, does not rise to "scouting for targets" to rob.

The officers claim that Defendant "bladed" away from them and walked away from the other men when the officers drove up in the parking lot; that he looked like he was trying to escape or at least run; that his eyes bulged and he was stuttering; that he would not respond to their questions and he had a bulge in his pocket which he clutched.  Based on the officers' description of Defendant walking away, it is unclear to the court just how one would turn and walk away without turning one or the other side away from the officers. Walking away from the police, even walking away quickly is not indicative of criminal behavior, without more.  Nor is clutching your pocket, especially when your pants are sagging and based on this Court view of the jeans during the hearing, several sizes too large.  The Court notes that the gun in question is quite small and quite light even when loaded.

It is also unclear to this Court how the Defendant could be "looking for a way to escape" from the strip mall depicted in the photographs presented during the hearing. This is merely the officers' speculation based on very little evidence. Even considering the totality of the circumstances, taking account of all of the officers' observations, the amount of time they had to observe and the nature of the area, not just a high crime area, but location of the shopping area and its visibility, there is just not enough for reasonable suspicion that a crime had been or was going to be committed.

Officer Cleaves testified that the Defendant acted differently than the other men. The other men thanked Taylor for being in the area, the same men who had been talking to Defendant seconds before. Officer Cleaves' testimony that Defendant got his attention because he acted differently than the other men, is likely most truthful. But acting differently, even given the totality of the circumstances presented here, does not rise to the level necessary to show reasonable suspicion that a crime had been or was going to be committed. A person is not required to be friendly to the police, to engage them and is free to walk away, unless the police can show something more than they have with these facts.

As noted, the Court finds the testimony about the determination of a "high crime area" by these officers to be the best the Court has yet heard. It may well be

17

that the officers believed they had heard enough dispatches that day to consider it a high crime area. But as noted before, that does not give the officers the right to just stop people on a hunch. What more is there for the court to consider? The officers' claim that the men were loitering outside the stores and were spending an unusual amount of time watching shoppers is completely unsupported by the amount of time the officers claim they were in the area. That the defendant walked away or even "bladed" away is not enough, even if the area was a high crime area to support a stop. The officers' testimony that there was a bulge in the Defendant's pocket is nothing more than a hunch given that the officer admitted the bulge could have been a cell phone or wallet or such. That the Defendant may have bulging eyes, or stuttered, even in a high crime area is not sufficient that a crime had been or was about to be committed. That one officer claimed he smelled marijuana, without a claim that it was Defendant that smelled of marijuana, does not allow the court to conclude this was a proper stop. The testimony that Defendant was looking for a flight route is complete speculation. The Court has only the officers' belief it was a high crime area, bulging eyes and alleged stuttering to form a totality of the circumstances. These are not enough. The officers had only a hunch and, a thin one at that, to stop the Defendant. Many of these circumstances, singularly or combined with others have not passed muster to validate a stop. *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir.

2011); *United States v. Mays*, 643 F.3d 537, 542 (6th Cir. 2011); *United States v. Pearce*, 531 F.3d 374, 377-78 (6th Cir. 2008); *United States v. Holyfield*, 282 Fed. Appx. 129, 131 (3rd Cir. 2008); *United States v. Hunter* 291 F.3d 1302, 1306-07 (11th Cir. 2002); *United States v. Moore*, 2001 WL 302057, *1 (6th Cir. Mar. 22, 2001); *United States v. Davis,* Case No. 11-20703, 2013 WL 71821 (E.D. Mich. Oct. 29, 2013), *aff'd* 544 Fed. Appx. (6th Cir. Feb. 13, 2014).

Defendant acted "differently" than the other men and the officers speculated he was armed. These were mere hunches and suspicions, not evidence of a crime or one to be committed. These officers had no articulable reason to believe a crime was afoot. Even if the officers' hunch is proved correct the Constitution does not condone the stop and search of an individual without a reasonable suspicion of criminal activity. There was none in this case.

### III.    CONCLUSION

For the reasons set forth above,

IT IS ORDERED that the Motion to Suppress Evidence Seized Pursuant to a *Terry* Stop **[Docket No. 24, filed February 21, 2014]** is **GRANTED**.

IT IS FURTHER ORDERED that a Pretrial Conference is set for **Thursday, November 6, 2014, 3:00 p.m.**

S/Denise Page Hood

        Denise Page Hood
        United States District Judge

Dated:  October 16, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 16, 2014, by electronic and/or ordinary mail.

        S/LaShawn R. Saulsberry
        Case Manager